David Thomson Haigler
2936 Northwoods Lake Court
Duluth, GA  30096
Cell Phone: (616) 334-0055
Email: joyfultrials@gmail.com
Pro Per

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DAVID HAIGLER,                            )
                                          )
                    Plaintiff,            )
v.                                        )      Civil Case No.:  12-12311
                                          )
THE CHURCH OF JESUS CHRIST OF             )      Tarnow
LATTER-DAY SAINTS;                        )
GRAND CANYON EDUCATION, INC.,             )
a Delaware corporation, dba GRAND CANYON  )      **FIRST AMENDED COMPLAINT**
UNIVERSITY;                               )      (TORT-NON MOTOR VEHICLE)
GRAND CANYON UNIVERSITY, INC.,            )
a Arizona corporation, dba GRAND CANYON   )      (Jury Trial Requested)
UNIVERSITY;                               )
CHRISTOPHER RICHARDSON, an individual;    )
LAW OFFICES OF MARSHALL A. MARTIN;        )
SCHLEIER LAW OFFICES, P.C.;               )
MORMON/LDS MEMBERS 1-100;                 )
                                          )
_____Defendant(s)._____)

PLAINTIFF, DAVID HAIGLER, Pro Per, hereby alleges for his Complaint as follows:

### INTRODUCTION

1. David Haigler would like to explain the length of his complaint is necessary in order to provide a complete understanding in a factual and chronological narrative that spans a four year period and includes three main legal arguments.  The first legal argument transpires over David's wrongful termination and retaliation for whistle-blowing at Grand Canyon University, which was protected under A.R.S. 23-1501 (3)(c)(i)(ii).  The second legal argument concerns

1

David's attempt to receive legal representation, which turned into intentional Breach of Fiduciary Duty, Breach of Contract, and Negligence.  The third legal argument deals with the continued physical, mental, and financial retaliation by the Church of Jesus Christ of Latter Day Saints and its Mormon/LDS members.  Events which started during David's employment at Grand Canyon University expose consistent Mormon/LDS involvement that penetrates this case from beginning to end.  David's complaint reflects how Mormon/LDS members protect one another and how the Church of Jesus Christ of Latter Day Saints has supported these members by assisting them in retaliating against him.

2.  Rather than allow David to receive his rights of legal remedy and protection, the Church of Jesus Christ of Latter Day Saints has willfully, intentionally, and maliciously engaged in tactics in order to sabotage David's efforts.  David's initial case started off as a simple whistle-blowing, retaliatory case that should have been resolved through the wrongful termination case he attempted to bring to the Court in 2010.  Instead, the Mormon/LDS members running Grand Canyon University marked David as a threat and the Church of Jesus Christ of Latter Day Saints responded by using military and governmental techniques to subdue and disseminate any accusations David would have taken public.  David, his wife, and children have endured continued break-ins of their home, sabotaging of evidence, and physical retaliation that continues to this day.  Even with the fear of continued physical retaliation, David realizes the importance of having faith and reliance on God and the Court to help defend himself, his wife, his children and others who have been targeted through these circumstances.  Being forced into a Pro Per position, along with having to prove several different arguments, and follow all legal procedures, David respectfully requests the Courts grace concerning the length and detail of the complaint.

## VENUE AND JURISDICTION

3.  Plaintiff, David Haigler was a resident of Phoenix, Arizona and Grand Rapids, Michigan during portions of events that took place.  Due to the continued physical retaliation David is now a resident of the Atlanta, Georgia suburbs.

4.  Defendant, the Church of Jesus Christ of Latter Day Saints, is a religious organization that is headquartered in Salt Lake City, Utah.  Even though the Church of Jesus Christ of Latter Day Saints is headquartered in Utah, they have a presence throughout the entire United States, including the States in question, Arizona, Michigan, Georgia and yet to be determined states.

5.  Defendant, Grand Canyon Education, Inc. dba Grand Canyon University is a corporation organized under the laws of the State of Delaware.

6.  Defendant, Grand Canyon University, Inc. dba Grand Canyon University is a corporation organized under the laws of the State of Arizona.

7.  Defendant, Christopher Richardson, an individual who resides and works in Arizona. Christopher was General Counsel for Grand Canyon University during David Haigler's employment from September 2008 to April 2009.

8.  Defendant, Law Office of Marshall A. Martin, is a law firm doing business in Scottsdale, Arizona.  Marshall was David Haigler's attorney from February 2010 to May 2010.

9.  Defendant, Schleier Law Offices, P.C., is a law firm doing business in Phoenix, Arizona.  David Haigler worked with Tod Schleier from December 2009 to February 2010.

10.  Defendants, Mormon/LDS Members 1-100, currently reside in Arizona, Michigan, Georgia and yet to be determined states.

11.  Jurisdiction for all of the stated causes of action is conferred upon this Court by 28 U.S.C. 1331 in that this action arises under the laws of the United States.

12.  Venue and jurisdiction are proper in the United States District Court, Eastern District of Michigan pursuant to 28 U.S.C. 1391(b)(1).  Defendant, The Church of Jesus Christ of Latter Day Saints, is headquartered in Salt Lake City, Utah, but has residents and/or citizens throughout the United States including Michigan.  Defendants, Mormon/LDS members are residents and/or citizens in Arizona, Michigan, Georgia and yet to be determined states.  All other defendants are residents and/or citizens of Delaware and Arizona.

13.  David Haigler alleges that the Church of Jesus of Christ of Latter Day Saints members have resided in Michigan from September 2010 until present day.  David also alleges the Defendants residing and/or citizens in Delaware and Arizona, which were involved in the facts rising to his cause of action, occurred during September 2008 to April 2009 and December 2009 to May 2010.  Therefore, venue is proper under 28 U.S.C. 1391(b)(2) in which a substantial part of the events took place in Michigan.

## SUMMARY OF COMPLAINT

**First Legal Argument:  Whistle-blowing and Retaliation at Grand Canyon University**

**Interview and Hiring**

14.  Significant Education, Inc, which changed to Grand Canyon Education, Inc, hired David Haigler in September of 2008 for the position of Online Enrollment Counselor for the Business Department.

15.  During the interview process David Haigler was told that Grand Canyon University is a Christian University and follows rules and guidelines that promote Christian morals and

values.  David was told that his position is regulated by the Higher Education Act, Title IV and the United States Department of Education and does not allow for incentives.

16.  During the interview process David Haigler was told that his benefit package would include free tuition for his Bachelor and Master's Degrees and his wife's Bachelor Degree.  David was told his position was considered salary non-exempt, which according to FLSA laws, meant that they had to pay time and a half for overtime.

### Training

17.  During training for Online Enrollment Counselors, David Haigler received the Grand Canyon University Training Manual.  Using the training manual, David was taught specific aspects concerning his job, which included but is not limited to learning a script called LOPES.

18.  The trainer, Brandon Haney, (who was the Director of Training), specifically wanted David Haigler and the rest of the training class to utilize the LOPES script and process while talking with perspective students, instead of the University of Phoenix scripts and processes that were being used by current employees.

19.  David Haigler, along with the training class, was promised continuing on-the-job training by their managers, which would include but is not limited to doing "Y-connects".  (Y-connecting is where David would sit with his manager or another top enrollment counselor and listen to the call).

### Working on the "Sales Floor"

20.  In mid October 2008, David Haigler finished the training course and became an actively working Online Enrollment Counselor for the Business Department.  During his initial

weeks of actively working on the sales floor, David's manager, Joshua Ellis, failed to give continued training or help as promised.

21. David Haigler asked for advice from Christy Volk, a teammate, concerning Joshua's failure to continue training or helping him. She warned David to be careful about speaking up or complaining against Joshua because he was a Mormon/LDS (Latter Day Saint). The warning included an explanation of how the Mormon/LDS members protected one another and complaining about them could cost him his job.

22. During the attendance of a department wide ongoing training session, Dino Meyer, (One of two Directors' of Online Business Enrollment), taught David Haigler and others a University of Phoenix script called AMOPS. Dino knowingly was misappropriating trade secrets in violation of A.R.S. 44-401 when he told everyone to write it down since he was unable to hand it out in writing, because the University of Phoenix owned the rights to the script.

23. In addition to receiving the AMOPS script from Dino Meyer, David Haigler received alternative scripts and processes other than AMOPS, which included RAMOPS and AMOPSR, all were variations of the University of Phoenix's scripts and processes. Management and team members told David that the University of Phoenix's material worked better and faster than the LOPES script and process.

24. Even though David Haigler was asked to use misappropriated trade secrets, he refused to use any of the University of Phoenix materials and attempted to use the LOPES script and process.

25.  Joshua Ellis told David Haigler that his job was to "hit his numbers", referring to generating applications of new students, which violates the Higher Education Act, Title IV, for demonstrating that David's job evaluation was based solely on enrollments.

26.  During another conversation with Joshua Ellis, David Haigler explained that he would not use the University of Phoenix's scripts or processes.  David also explained to Joshua that his offer letter for the online enrollment counselor position clearly stated that no new employee would use other company's material.

27.  David Haigler became concerned over the proliferation in using the University of Phoenix's material by management.  David's concern was amplified with the consistent focus on only application numbers.  The focus was so strong that management sent out "STAC" rankings, which were based solely off enrollment counselor's applications.

28.  David Haigler's concern over the pressure of getting applications was also heightened by the fact that perspective students were enrolled, registered for classes and approved for Financial Aid before the admissions department was able to verify the perspective student's qualifications.  This violated Grand Canyon University policies along with the Higher Education Act, Title IV and the United States Department of Education rules.

29.  During a team meeting Joshua Ellis explained to David Haigler and several others that each person needed to "hit eight applications" for three months in a row to qualify for free tuition.  David and the others told Joshua that they were hired with free tuition being a benefit, not an incentive, which violates the incentive rule 20 U.S.C. 1094(a)(20).  This also violates the incentive compensation ban established through the PPA, HEA, Sec. 487(a) and (a)(20); 24 C.F.R. 668.14(1)(1) and (b)(22).

### Initial Whistle-blowing to Human Resource

30.  On December 2, 2008, David Haigler went to Human Resource and spoke with Linda Lair concerning the free tuition issue.  David informed Linda about every violation of various laws, regulations, and University policies that he had been told to break or was in use.  These included but are not limited to, the use of University of Phoenix's enrollment scripts and processes, focus on "hitting the numbers", and evaluation of employees based solely on applications.

31.  Based on whistle-blowing to Linda Lair as referenced in (30), David Haigler expressed concern about retaliation from management and asked to be moved to a different team.

32.  Several days later David Haigler contacted Linda Lair concerning his request to be moved to a different team.  Linda expressed confusion as to what David was talking about and he replied via email summarizing their prior discussion.  Linda responded with surprise as though she knew nothing and requested another meeting to review all issues and concerns again.

33.  During the second meeting with Linda Lair, David Haigler re-explained all whistle-blowing issues as referenced in (30).  Linda told David that management is currently investigating some of these issues and acknowledged David's concern over being retaliated against.  Linda then asked David to help Human Resource by continuing to tell them of any other issues that arise, but would not assist in transferring David to another team.

### Continued Violations after Whistle-blowing

34.  On December 5, 2008, a companywide email was sent out explaining the Do-Not-Call List, laws and regulations, and that all employees have to run all phone numbers from leads through the database to avoid breaking these laws and regulations.

8

35.  On December 10, 2008, during a "blitz session" (blitz session is when management hands out leads to employees that only have basic information of a lead, solely for the intent of getting someone on the phone); Joshua Ellis told David Haigler and the rest of the team to ignore running these phone numbers through the Do-Not-Call database.  After questioning Joshua about the email as referenced in (34), he stated Dino Meyer gave the approval not to follow the law.

36.  David Haigler emailed Linda Lair and whistle-blew concerning managements decision to violate the Do-Not-Call laws.  David explained his confusion to Linda about how management would tell employees the rules and laws, but then asked employees to violate the rules and law.

37.  David Haigler sent out emails concerning the issue referenced in (34 and 35) to Dino Meyer and Jacob Mayhew, (A second Director of Business Online Enrollment).  The end result of the communications involved Dino sending an email to department managers specifically stating in bold print, "MAKE SURE ALL BLITZ SHEETS ARE DESTROYED/SHREDDAR. (Sic) These should not be kept past the day of blitzing".

38.  During December 2008, David Haigler's team lead, Mark Silva, taught him to get a call back from a perspective student who had partially applied.  Mark told David to leave a message on the perspective student's voicemail asking them to confirm their address so the bill for the $100 application fee can be sent out to them.  Mark told David other employees used this fear tactic to get a chance to talk to the perspective student again.  David refused to use this tactic since no fee existed and using it violated University policies and State and Federal laws.

39.  On December 16, 2008, Joshua Ellis led a team meeting that involved personal detail about his working at University of Phoenix and how he became successful using their training

material.  Joshua then gave a history of AMOPS, the University of Phoenix's script and process, and reiterated to everyone, including David, that this is what everyone should use again.

40.  At the meeting referenced in (39), David Haigler's team lead, Mark Silva, spoke to the entire team and supported Joshua Ellis's statements of not following LOPES, but instead using University of Phoenix's AMOPS script.  Mark specifically spoke to Samiyya Muhaimin, a new team member, and told her to forget Grand Canyon University's training because it won't work in "hitting the numbers" and that "numbers is what it is all about".

41.  After the December 16, 2008, meeting, Joshua Ellis approached David Haigler at his cubicle and asked David if he would use the University of Phoenix material.  David told Joshua that he would not use the University of Phoenix material or fear perspective students by telling them they would be getting a bill for $100 application fee.  Joshua became visibly and verbally upset with David.

42.  On December 19, 2008, David Haigler met with Dino Meyer and whistle-blew to him about every issue that he had already whistle-blew to Linda Lair in Human Resource.  David expressed his concern with Dino about retaliation from Joshua Ellis and requested to transfer to a different team.  Dino responded by stating, "Why transfer, since these types of problems are all over the floor".

43.  In December 2008, David Haigler met with Jacob Mayhew and whistle-blew to him about every issue that he had already whistle-blew to Dino Meyer and Linda Lair.  Jacob ignored the complaints and told David he "didn't care if he used LOPES or AMOPS, just as long as he got applications".

44.  During December 2008 David Haigler had conversations with Joshua Ellis, confirming he was a Mormon/LDS member, along with Jacob Mayhew, Joshua's supervisor. Even with David's whistle-blowing no changes were occurring, but instead violations of University policies and rules, along with violations of State and Federal laws were exasperated. This information and results supported what Christy Volk, David's teammate, told him as referenced in (21) concerning Mormon/LDS members being protected.

45.  During December 2008, David Haigler continued to tell Linda Lair about the continued violations.  David also continued to discuss his concern over being retaliated against and his desire to move to a different team or department.

### Whistle-blowing to Human Resource about Overtime Compensation

46.  David Haigler's paystub dated December 24, 2008, reflected four hours of overtime, but no pay accompanied the hours.  Through several conversations with Payroll, David was told to pick up his check at the payroll office.  When David picked up the check he realized that the amount of overtime pay was incorrect.  After speaking with Payroll, he was told that all enrollment counselors get paid half-time pay and not time and a half as per FLSA laws.

47.  David Haigler went to the Human Resource department and was told that the issue would be looked into.  The following day Linda Lair forwarded David an email with an attachment explaining that the half-time pay is correct.  Part of the attachment was cut off and Linda's reasoning was that the rest of the information did not matter.

48.  David Haigler researched the information and found the rest of the attachment explained Grand Canyon Education, Inc did not meet the qualifications to pay half-time.  Human

Resource and Linda Lair purposely lied to David in order to try and cover up the illegal FLSA violations.

49.   Through follow up conversations David Haigler met with Linda Lair and Brenda Rigatti, Linda's supervisor, to discuss the overtime issue.  At the end of the conversation Brenda told David, Grand Canyon Education, Inc. makes up and chooses how to pay their employees. David responded by reading the FLSA laws directly from their website revealing Grand Canyon Education, Inc. must follow the time and a half law.  Brenda responded to David, "Due to the scope of your concern, we will have to get back with you".

## Joshua Ellis attempts to retaliate against David Haigler

50.   On January 6, 2009, David, along with his team, received an email that was started by Stephen Franke, a team member, sneaking onto Shelly Campbell's, a team member, computer violating company policy.  This turned into a chain email from several other team members and eventually became sexual in nature.  Towards the end of the email chain David witnessed Myles McCarthy, a team member, mimicking Shelly talking as though she had a penis in her mouth and was gurgling up semen.  This violated several rules, policies and laws.

51.   During this sexualized chain email, Joshua Ellis, participated in some of the responses.  After David witnessed Myles mimicking the sexual act, he sent out a team email expressing concern that it had gone too far and should stop.

52.   After a short time an email went out to the team from Mark Silva, David Haigler's old team lead that wanted him to use fear tactics.  This email contained a Bible verse concerning judging others and was clearly meant for David, especially knowing that David lived by the Evangelical Christian faith.

53. Since Joshua Ellis did not stop this negative attack, David went to Mark Silva's cubicle to try and resolve any issue. Mark started yelling at David to get out of his cubicle, which prompted Joshua to come over to the cubicle. As Joshua approached, Mark came out of his chair in a threatening manner towards David. Joshua pushed David back to protect him and held his hand on Mark's chest to keep him from attacking David.

54. Concerned about the situation referenced in (50-53), David went and spoke briefly with Jacob Mayhew and Linda Lair. Both Jacob and Linda asked David to forward the emails and told David they would speak with him later concerning the incident.

55. When David returned to the team he noticed Mark was gone and went to speak with Joshua who was typing an email. David asked Joshua what was going on and Joshua responded that Mark went home and that he sent an email to Joshua stating that David had threatened him. David attempted to verify with Joshua that no one verbally threatened anyone, but Joshua refused to tell the truth and chose to write an email making David at fault.

### Whistle-blowing to CEO, Brian Mueller and VP, Stan Meyer

56. Realizing that Joshua was using the incident referenced in (50-53) to get him in trouble, David, believing his job may be in jeopardy, sent an email to the CEO, Brian Mueller, and the VP, Stan Meyer on January 7, 2009. In the email David whistle-blew concerning many of the issues that had been going on and expressed his concern over his job security.

57. On January 8, 2009, David Haigler was pulled into Dino Meyer's office and told he was being switched to a different team in the Business Online Enrollment Department. The new team manager showed David around and pointed out several desks that he could sit at the following day when he was to move.

58. On January 8, 2009, David Haigler met with Brian Mueller, Stan Meyer, and Christopher Richardson (who unknown to David at the time was general counsel and part owner of the University). During the short meeting David told Brian, Stan, and Christopher about all of the whistle-blowing and the ongoing continued violations afterwards.

59. At the end of the meeting referenced in (58), Brian Mueller told David that "as long as he was being honest his job was not in jeopardy".

## David Attempts to Get Help

60. On January 9, 2009, David Haigler received notification from his new manager that there were no desks available, contradicting what the manager said the day before. David was left sitting with his old team, leaving him in an uncomfortable situation with no solution.

61. On January 12, 2009, due to a lack of progress concerning transferring, David Haigler sent an email to Rhonda Pigatti in Human Resource, stating there was apparently a need for him to go outside of Grand Canyon to get help. Shortly afterwards David received a response from Rhonda setting up a meeting with him for that same afternoon.

62. During the meeting as referenced in (61), Susan Blanche told David that he was transferred to another team in Business and that is where he would stay. David responded by quoting Dino Meyer as earlier stating to him that there were similar problems throughout the entire Business Enrollment Department. Sue immediately retracted her statement and told David he was transferring to the Education Online Enrollment Department effective the following day.

63. On January 13, 2009, David Haigler went to the Education Online Enrollment Department where he met Lauren Grossman, his new team manager. David received and downloaded training materials from Lauren and the Education Departments Training hard drive.

David reviewed the material and realized the closing scripts misled and lied to perspective students violating various University policies and State and Federal laws.

64.  David Haigler's concern about receiving more material that violated rules and laws prompted him to speak with the campus pastor on January 14, 2009.  During his meeting with the pastor, the pastor affirmed he was not the only enrollment counselor to express concern over the practices and pressures of getting applications.

65.  During the same meeting as referenced in (64) along with a second meeting, David Haigler also had conversations with the campus pastor concerning the Mormon/LDS influence.  The campus pastor stated that the Mormon/LDS members refused to attend events because they did not participate with Evangelical Christians.  He also informed David that there was so many Mormon/LDS members hired in at Grand Canyon University that there was discussions about the university becoming a Mormon/LDS school.

66.  David Haigler spoke with Lauren Grossman on January 14, 2009, about his concerns with the training materials containing misleading statements and lies.  Lauren responded that she would help transfer him to a different department since he was uncomfortable working there.

67.  On January 16, 2009, David Haigler met with Christopher Richardson, Heyward Howell and Sue Blanche, which David insisted on tape recording due to the outcomes of prior meetings with management.  David had also discovered that Christopher and Brent Richardson were Mormon/LDS members and owners of Grand Canyon Education, Inc.  After twenty minutes of badgering and attacks for wanting to record the meeting, Christopher agreed to record the meeting.  This meeting was supposed to be about finally addressing David's overtime issue and the January 6th incident.

68.  At the meeting referenced in (67), David asserts that it was more of a deposition by Christopher than a conversation about the agreed upon issues.  David re-affirmed the whistle - blowing issues he had already previously discussed with Linda Lair, Dino Meyer, Jacob Mayhew, Brenda Pigatti, Susan Blanche, Brian Mueller and Stan Meyer.

69.  During the meeting referenced in (67-68), David was told to re-tell the January 6, 2009, incident, but was given no other information about it.

70.  During the meeting referenced in (67-68), Susan Blanche lied to David concerning the overtime situation and told him the company was changing all enrollment counselors from salary to hourly.  This change came directly from David's whistle-blowing.

71.  In the same meeting as referenced in (67-68), David Haigler was told by Susan Blanche that Human Resource would help assist him in transferring to a different department outside of Online Enrollment.  David was also informed by Christopher Richardson that his job was not in jeopardy.

**Retaliation**

72.  On January 21, 2009, David Haigler was to meet with Sue Blanche to discuss transferring to a different department.  David requested the meeting be recorded, Sue refused and the meeting was over.

73.  On January 22, 2009, Sue Blanche ordered David down to the Human Resource office where she told him that Human Resource would not help him transfer as was promised in the January 16, 2009 meeting.  Knowing that Human Resource was allowing other enrollment counselors to transfer proved that David was the focus of deliberate retaliation and discrimination.

74.  At the same meeting on January 22, 2009, Sue Blanche gave David Haigler a manila folder containing a letter with written lies concerning all of the circumstances that had supposedly occurred up to that point.  The letter reduced David's issues with Joshua Ellis to merely not getting along, instead of the truth of his blatant, intentional violations of rules and laws.  The letter also contained two accusations alleging his failure to cooperate with his new manager and the threat of dismissal.  Sue threatened David verbally that he needs to stop speaking up about violations and if he continued he would be fired.

75.  On January 23, 2009, David Haigler emailed Brian Mueller, Stan Meyer, and Christopher Richardson expressing his frustration, concern and defense about his job being threatened.  David provided proof that both allegations referenced in (74) were in fact fraudulent and made up to intimidate and fear him.

76.  With no one responding to David's proof that the allegations were fraudulent, David was called into a meeting on January 27, 2009, by Lauren Grossman.  During this meeting, Rhonda Pigati, from Human Resource, and Lauren gave David a write up for the January 6, 2009 incident as referenced in (50-53).  Knowing the other accusations were fraudulent, Human Resource and Management blamed David for the incident to once again intimidate and threaten his job.

77.  During a meeting with Lauren Grossman, David Haigler was told he would not receive his six month evaluation.  Lauren told David his lack of applications was the sole reason for not receiving his evaluation, supporting the fact that Online Enrollment Counselors were solely evaluated on applications violating the Higher Education Act, Title IV incentive compensation ban.

78. Lauren gave incentive to Audri DeBoef, the teammate sitting behind David to speak badly about him and request a move.  David asserts that Lauren then moved Jay Park, another teammate, behind him, who was a Mormon/LDS member in an attempt to monitor him.

79. On April 6, 2009, David Haigler was finally given an opportunity to "Y-connect" with another top enrollment counselor, something he had been refused since October 2008.

80. On April 6, 2009, during the "Y-connect" David Haigler witnessed the top enrollment counselor watch a baseball game on the computer, without warning show David a picture of a woman's breasts on his camera, and finally participated in repeatedly lying to both perspective students he was able to talk too.

81. David Haigler was so stunned by the outrageous behavior he began to question if it was a set up by management to find out if he would whistle-blow again or keep quiet.  When Lauren asked him how the "Y-connect" went, David asked for the evening to think about things knowing that if he whistle-blew again they would fire him.

82. On April 7, 2009, David Haigler sent an email to Lauren about what happened the day before during the "Y-connect".  David made it clear that he would not utilize the immoral, unethical, and illegal tactics as was presented to him by the top enrollment counselor.  David also met face-to-face with Lauren and told her the same thing, at which time Lauren said nothing.

83. On April 8, 2009, David Haigler sent an email to the Education Department Directors regarding the "Y-connect" incident and Lauren's refusal to respond and address the issues that arose.  David also sent another email to the Directors asking for specific information based on the top enrollment counselors claims to perspective students.  These claims included but are not

18

limited to Grand Canyon having the ability to reduce tuition by 40% to 50% and that they were a top 25% premier college therefore allowing them to offer the Teach Grant.

84. On April 8, 2009, Lauren Grossman sent David an email containing numerous attachments that all were about him. Among those attachments was one email sent at 9:06 a.m., that morning, between Directors in Education Enrollment concerning David. The email stated that David should not be involved in anymore "y-connects" "as this will just pose more challenges".

85. In response to receiving these emails on April 8, 2009, David sent an email to the Directors of Education and Lauren Grossman. He stated, "I have my facts in order and the paperwork to support it, I am over the fact that management will create fraudulent documents against me (again I have proof)". Fifteen to twenty minutes after this email, David was brought down into a meeting with Director Renee Korecky and Rhonda Pigati of Human Resource and was terminated.

86. David Haigler was only told that "things are just not going to work out" and was given some paperwork that included a separation and release agreement. David called Human Resource several days later and told them that he was not going to sign the separation and release agreement.

87. David Haigler asserts that after he refused to sign the separation and release agreement that Christopher Richardson contacted other Mormon/LDS members that belong to the Church of Jesus Christ of Latter Day Saints in order to receive assistance and protection against future litigation from David.

88.  David Haigler asserts that the Church of Jesus Christ of Latter Day Saints have members that have significant military, law enforcement, and governmental backgrounds.  These Mormon/LDS members use all their training, techniques, and technologies to monitor, retaliate, and subdue individuals, such as David, who are deemed a threat to Mormon/LDS businesses regardless of the legality of their methods.

### Second Legal Argument:  David's attempt to get Legal Representation

### Initial meeting with Tod Schleier

89.  David Haigler met with Tod Schleier in the summer of 2009 to discuss filing a wrongful termination case against Grand Canyon Education, Inc.  Tod informed David that he was currently working on a case against Grand Canyon University, but did not give any details concerning the case.  Tod told David to organize any evidence and bring it back to him if he wanted to continue to pursue a wrongful termination case.

### Beginning of Retaliation by Mormon/LDS members

90.  During the following months David Haigler started to receive prank phone calls which eventually led to David calling back the phone number and leaving a frustrated and angry message not to call again.  David asserts Mormon/LDS members were responsible for these calls.

91.  While David Haigler was working on organizing the evidence on his computer he realized that the computer was being sabotaged.  Before David could finalize organizing the evidence for a wrongful termination case his computer was crashed permanently and had to purchase another computer.  David asserts Mormon/LDS members were responsible for hacking and the crashing of his computer.

1

2

### Tod Schleier Illegally Soliciting David Haigler

3

92.  At the end of October 2009, David Haigler received a phone call from Tod Schleier

4

soliciting David to bring his evidence in.  Tod also attempted to entice David to bring in the

5

evidence by telling David there was another case that he potentially could bring David into if he

6

7

got the evidence to him before the end of the year.

8

### Sitting on Evidence/Grand Canyon University Rushing to Settlement

9

93.  David Haigler dropped off two binders in mid-December 2009 to Tod Schleier, that

10

contained evidence organized with a table of contents, tabs, and a summary of the Arizona

11

Statutes that supported his wrongful termination claim.  The following week after Tod received

12

David's evidence Grand Canyon Education, Inc filed for an expedited settlement in their qui tam

13

case.

14

15

94.  After waiting until January of 2010, David Haigler contacted Tod concerning his

16

review of the evidence at which time Tod requested more time.  Tod emailed David telling him

17

that he had reviewed one of the binders and was working on the second binder.  David responded

18

by telling Tod of his concern over the time to file due to the statute of limitations being one year.

19

20

95.  Tod Schleier eventually responded telling David that there were issues with the other

21

Grand Canyon case and that his representing David may be a conflict of interest.  Tod then gave

22

David two other attorney's names to contact for representation and David picked up his evidence

23

24

from Tod.

25

96.  Unknown to David Haigler at the time was that Tod's representation of the client in

26

the qui tam case against Grand Canyon Education, Inc, asserted the same claims that David had

27

asserted in his evidence.  Just in reading the table of contents Tod would have known that

28

David's evidence was immediately in conflict of the case he was already representing. David asserts Tod purposely held onto his evidence which helped the Mormons/LDS members in the Grand Canyon case.

### Initial meeting and Retaining Marshall Martin

97. David Haigler met with Marshall Martin on February 17, 2010, and told his entire story to Marshall who wrote everything down to be used as the premise for a demand letter. Marshall told David his case was very strong due to the evidence he had and he would represent David in a wrongful termination case.

98. David Haigler and his family met with Marshall Martin on February 23, 2010, to discuss and retain Marshall as their attorney. During this meeting David specifically told Marshall about their financial position and at no time did Marshall discuss doing a full contingency or the cost of litigation. Marshall also signed a contract for services to be provided which he would later fail to provide.

### Initial working of case

99. On February 26, 2010, David Haigler emailed Marshall Martin the information he requested concerning their financial loss in benefits and their personal desire of a demand amount. After a discussion with Marshall, he asked David if he could increase the demand amount and after David agreed, Marshall put together a demand letter.

100. On March 5, 2010, Marshall Martin sent Christopher Richardson an email that contained the demand letter along with some evidence.

101. On March 19, 2010, David Haigler sent an email to Marshall Martin concerning a billing statement he received in the mail. Through several emails David attempted to clarify the

cost based on work done, the request of another retainer (since Marshall did not disclose he would be billing this way), and reaffirmed with Marshall that he would not be able to continue paying $2,000 retainers.

102. On March 23, 2010, David Haigler spoke with Marshall Martin over the phone to discuss his financial position. During this conversation Marshall offered a partial contingency, which David accepted, but David also told Marshall they cannot afford a full trial.

103. On March 30, 2010, David Haigler dropped off a $2,000 retainer, which was the last retainer he could afford and was disclosed to Marshall Martin. Even with David telling Marshall he could not afford any more retainer fees, Marshall told David he would litigate the case.

104. On April 1, 2010, David Haigler emailed Marshall Martin concerning the write up of the complaint that he was going to file. David expressed concern it was not written up as Marshall had told him and the complaint left out specific evidence supporting David's claims.

105. After discussing issues with the complaint, David Haigler trusted Marshall Martin in the filing of the complaint after some adjustments were made. Marshall filed the complaint on April 5, 2010, at which time Christopher Richardson had still not responded to the demand letter.

106. During the same time David Haigler found out who the judge was assigned to the complaint and questioned Marshall concerning the potential of the judge being a Mormon/LDS member. Marshall stated, "Nothing in her background suggests she is LDS, including the fact that she has had a long and continuous career as a professional working outside the home".

107. Marshall Martin received a call on April 14, 2010, from Nicholas Brown, who worked for Grand Canyon and went through training with David Haigler. Nicholas affirmed

with Marshall that David's accusations were true, he had evidence supporting David's accusations, and he would be willing to support David as a witness.

108.  On April 16, 2010, Marshall Martin told David Haigler over the phone about his conversation with Nicolas Brown and him being a witness for David.  During the same phone call Marshall discussed his conversation with Justin Pierce, Grand Canyon Education, Inc and Grand Canyon University, Inc's, new counsel.  Marshall told David that neither company would settle for six figures and maybe settle for attorney's costs.

109.  On April 16, 2010, during the same phone call as referenced in (107), Marshall discussed with David Haigler his conference call with David Barton who represented University of Phoenix.  Marshall discussed University of Phoenix's interest in David's case and that if the University of Phoenix came on board they could help pay attorney's fees.  Marshall also asked David if he would want a job at the University of Phoenix, which David knew was an illegal bribe and became concerned about Marshall's intent.

110.  Along with attempting to see if David would take a bribe, Marshall also requested another $2,000 retainer, even though David had previously told him they don't have it.

**Marshall attempts to sabotage case**

111.  After the April 16, 2010, phone call with Marshall, David became greatly concerned with Marshall and what his intentions were concerning his case.  David found out during the weekend that both Justin Pierce and David Barton were of the Mormon/LDS faith.

112. On April 19, 2010, David Haigler discussed with Marshall Martin whether or not he was a Mormon/LDS member or affiliated in a way that would create a conflict in representing

him.  Marshall told David he was not a Mormon/LDS member, but that his long time law mentor

was a Mormon/LDS member, however this in no way would conflict with his representation.

113.  During the following week David Haigler and Marshall Martin had several

discussions concerning the case.  Marshall engaged in attempting to put fear in David concerning

"after acquired evidence" and proceeded to keep repeating that David would lose his entire case.

114.  David Haigler investigated other lawsuits concerning the "after acquired evidence"

rule and discovered that Marshall was unaware that recent cases would not support him losing

his entire case.  David proceeded to discuss with Marshall cases that would support and defend

his case against a claim of "after acquired evidence".  Instead of educating himself about the new

court rulings supporting David's case, Marshall became very angry at David and refused to

acknowledge or discuss the cases David found.  Marshall continued to attempt to fear David into

settling the case.

115.  On April 23, 2010, David Haigler and Marshall Martin met with David Barton and

discussed generalities of the case.  David informed David Barton that he was in possession of a

University of Phoenix script, dated 2006, that violated the Department of Education's rulings and

findings against them.  David refused to give David Barton the name of the current University of

Phoenix employee who was using it.

116.  Even though David Haigler did not give David Barton the name of the employee as

referenced in (115), the employee's MySpace page reflecting his current employer and status at

University of Phoenix was taken down several days after the meeting.

117.  On April 23, 2010, David Haigler met with Marshall Martin after their initial

meeting with David Barton.  During this meeting Marshall continued to instill fear that David

would lose his entire case and that he needed more money.  Only after David told Marshall he would do the case on his own, Marshall brought up doing a full contingency payment plan.

118.  David Haigler asserts that Marshall Martin's decision to do a full contingency payment plan was solely based on keeping David as a client in order to avoid David exposing evidence through representing himself.  David asserts that Marshall's job was to control David and the evidence he had to help protect the Mormon/LDS members and not to actually litigate or give David his legal remedy.

119.  During the following week Marshall was gone David Haigler corresponded by email with Dianne (Marshall Martins Assistant) concerning the whereabouts of specific evidence.  David found out through this email correspondence that both Marshall and Dianne had been lying about the whereabouts of this evidence.

120.  During the same email correspondence as referenced in (119), David Haigler also found out that Dianne was using Marshall's email address as her own and at times would sign his name to the email correspondence.  Even though the email correspondence was written by Dianne, Marshall would charge David at his hourly rate instead of hers thereby overcharging for services rendered.

121.  When Marshall Martin returned from being gone for a week he emailed David on May 5, 2010.  In this email Marshall references, "No word from GCU's attorney", but in Marshall's own notes from April 16, 2010, Grand Canyon University's attorney was waiting on David's response.  Marshall had never told David that Grand Canyon University was waiting for a response and David only found out after Marshall dropped him as a client.  Marshall had failed to give David all pertinent information concerning the case.

122.  Also in the email referenced in (121), Marshall talks about going "back to Grand Canyon University with more of our evidence".  Marshall had been telling David this entire time that they should not go back with any evidence and had not even given Christopher Richardson the CD evidence he had requested back when he received the demand letter.

123.  Marshall Martin also in the email referenced in (121), tells David that "additional retainer is necessary at this time".  Even though Marshall had talked with David about doing full contingency on April 23, 2010, he again is asking for more money.

124.  Based on everything that transpired from April 16, 2010, which includes but is not limited to Marshall Martin, lying, withholding information, attempting to bribe, instilling false fears, and putting undue stress concerning financial payment, David chose to address everything with Marshall.

125.  On May 10, 2010, David Haigler spoke with Marshall Martin over the phone and discussed all of his concerns and issues.  Marshall responded in a very defensive manner and refused to answer any of David's questions or address any issues.  Marshall repeated past comments about the case and made comments about David trusting him.

126.  On May 13, 2010, David Haigler received an email from Marshall Martin containing an attachment, which was a letter discussing the fact that he was dropping David as a client.  David spoke with Marshall over the phone expressing his frustration over threatening to drop him without any notice.  Marshall told David that in order for him to continue to represent him, David would have to give up his right to settle, which would violate David's rights.

127.  David asserts the letter as referenced in (126), was simply a psychological and fear tactic by Marshall to have David stop asking questions or bringing up concerns or issues.  David

also asserts that Marshall's ultimate goal was to settle and not to litigate the matter, whereby supporting the Mormon/LDS members over his own client.

128.  On May 20, 2010, David Haigler met with Marshall Martin at his office to discuss the contingency letter and for David to attempt to get answers to certain concerns and issues. Marshall proceeded to yell at David and berate him, attempting to make David feel guilty for asking questions or having concerns.

129.  On May 27, 2010, David Haigler emailed Marshall Martin a letter that described his concerns and issues.  This letter also asked Marshall to answer certain questions and put in writing his full expectations concerning the contingency letter, which included David giving up his right to settle.

130.  On May 28, 2010, David Haigler received an email with a letter and court documents that told him that Marshall was dropping him as a client.  David spoke with Dianne concerning picking up a copy of his case file and all the evidence.

131.  Through the following month David filed court documents attempting to get the court to force Marshall to finish the case due to his intentional violation of the Arizona Rules of Professional Conduct.  Eventually the court granted Marshall his request to be released from David's court case.

132.  After Marshall formally dropped David as a client, David proceeded to find another attorney who would take the case.  David was unable to find an attorney that would take the case on full contingency, thereby forcing him to represent himself due to Marshall Martin's Negligence, Breach of Contract, and Breach of Fiduciary Duty.

## Working and Researching on the Case

133.  During David Haigler's research of Christopher and Brent Richardson, he discovered a past of fraudulent business practices.  These fraudulent business practices carried over into the purchase of Grand Canyon University.

134.  David Haigler discovered that Christopher and Brent Richardson had opened a new company called Grand Canyon University, Inc, on July 1, 2008.  This company is classified as doing business as Grand Canyon University, however the Richardson's failed to amend the May 2008 SEC filing that only showed Grand Canyon Education, Inc as the only company doing business as Grand Canyon University.

135.  David Haigler was going to include in his amended complaint that as of the initial public offering in November 2008, neither the SEC nor the public knew of Grand Canyon University, Inc, violating SEC rules and regulations.

136.  David Haigler discovered that Christopher Richardson had also opened a law firm and was using that law firm to deal with employee issues of Grand Canyon University, Inc.  Christopher Richardson never disclosed his association or relationship with the law firm in any SEC documents.  David also discovered that Christopher Richardson's law firm clients were connected to potential business schemes and fraudulent dealings.

137.  David Haigler discovered that the majority of the original owners of Grand Canyon Education, Inc, were Mormon/LDS members.  After the initial public offering these other Mormon/LDS members entered into a voting right agreement giving the Richardson's the controlling share of Grand Canyon Education, Inc.  David asserts this was the original intentions

of the Richardson's and purposely defrauded investors into believing that there was no controlling party when the initial public offering occurred.

138.  David Haigler discovered that Christopher and Brent Richardson's father, who owned MindStreams, which sold perspective student leads to Grand Canyon University, was violating the Higher Education Act, Title IV by incentivizing his employees pay for applications. As per the Higher Education Act, Title IV rules and regulations Grand Canyon Education, Inc, is as responsible for MindStreams actions as though it was doing it themselves.

139.  In researching the qui tam that had been filed against Grand Canyon Education, Inc, David Haigler found that Grand Canyon Education, Inc had lied over fifteen times in its response submitted to the court.  If David's evidence had been made public at that time it potentially could have raised issues with Grand Canyon Education, Inc getting a settlement and immunity.

140.  In the complaint filed by Tod Schleier for the qui tam, he asserts that Grand Canyon Education, Inc had been violating certain laws since 2001.  David Haigler discovered that Grand Canyon Education, Inc only owned Grand Canyon University since the end of 2003.  David asserts that Tod Schleier would have known of this discrepancy, but included it in order to help out Grand Canyon Education, Inc. owned by Mormons/LDS members.

141.  As David Haigler was uncovering the evidence referenced in paragraphs (133-140), Christopher Richardson started to make changes to his law firm and the Richardson's were making changes with the SEC concerning Grand Canyon Education, Inc.  These changes included but are not limited to, making Grand Canyon University pay for any legal expenses for those in Human Resource.  These are the same individuals that helped fear, intimidate, and eventually fire David, including Lauren Grossman who had been promoted to Human Resource.

142. David Haigler was amending his wrongful termination complaint to include but not limited to the referenced evidence in (133-140). David asserts that his decision to include all of the evidence he was adding to the amended complaint would have been damaging to the Mormon/LDS members. David asserts that at this point the Mormon/LDS members and the Church of Jesus Christ of Latter Day Saints used all retaliatory measures as was necessary to make sure David did not disclose this evidence in court.

**Third Legal Argument:  Retaliation by the Church of Jesus Christ of Latter Day Saints**

**Feared and Intimidated into dropping case**

143. During Friday, September 17, 2010, David Haigler told his wife that he would submit his amended complaint Monday morning. When David and his family returned home that evening a Mormon/LDS member had broken into their home and crashed their computer. David was unable to retrieve any files, evidence, or his amended complaint and now could not submit it as was discussed earlier in the day. David immediately called the police and reported the incident.

144. After continuing to search their apartment for anything else missing, David Haigler called the police again around 2-3 a.m. David reported that a box of personal paperwork from 2006-2007, that included but is not limited to medical records, bank statements, and collection documents was missing. David also reported that some of the physical evidence outside of the computer he had for his court case had been tampered with.

145. The following morning, Saturday, September 18, 2010, David Haigler and his family decided to drive to the downtown police station to try and get some help and file a complaint. When David and his family left the apartment a Mormon/LDS member followed

them and after driving through four different major shopping areas the Mormon/LDS member finally stopped following them.

146. When David Haigler and his family reached the downtown police station they were greeted by two police officers. David attempted to explain their situation to one officer, while the other officer took his wife aside and harassed her into crying. The police officers started to question David and his wife about how their vehicle was running and kept discussing the vehicle, which neither David nor his wife even complained about. Both David and his wife felt intimidated and fearful based on the officers discussion and their refusal to investigate anything.

147. During a 4 a.m. Sunday, September 19, 2010, walk down to the corner gas station to make a phone call on the pay phone, David Haigler was again followed. This affirmed to David that Mormon/LDS members were involved in illegal surveillance and were intentionally trying to intimidate, coerce, and cause undue duress.

148. After the break in, lack of police support, and being followed David Haigler believed it would be in his best interest of protecting his family to move back to Michigan immediately. Shortly after David decided to move that Sunday afternoon, September 19, 2010, two police officers showed up at the door. The police officers told David and his wife that they had received an anonymous tip that there were issues. During the conversation the police described information that only David and his wife had spoken about to each other in the privacy of their home. This information had not been shared with anyone else thereby affirming that Mormon/LDS members were listening in on David's apartment using illegal electronic methods.

149. Starting on Monday morning, September 20, 2010, David Haigler woke up and asserts that he was heavily drugged up. David asserts that Mormon/LDS members used drugs, along with other methods, to control his behavior throughout that week.

150. David Haigler also noticed the same day, September 20, 2010, that his wife and children's behavior was noticeably different and unlike their normal personalities. His wife and children's behavior was so drastically different that it caused David to believe that the Mormon/LDS members threatened his wife and children.

151. During one night that week, the storage shed on the porch, filled full of belongings, was emptied overnight and all the contents were placed on the balcony. Neither David Haigler nor his wife emptied the contents of the storage shed, revealing that the Mormon/LDS members had been in the apartment the night before.

152. On two occasions David Haigler came across electronic devices that had been hidden and been used to monitor his wife, children, and himself. David asserts that these and more devices would disappear overnight, thereby affirming the Mormon/LDS members were entering David's apartment at night. This also supports David's assertion that the Mormon/LDS members were illegally using electronic devices to monitor his wife, children, and himself violating their civil rights.

153. David Haigler asserts that Christopher Richardson, a Mormon/LDS member, along with other Mormon/LDS members are the only individuals that had motive to specifically tamper and destroy David's computer and physical evidence. David also asserts that the Church of Jesus Christ of Latter Day Saints is the only entity that has the motive, means, and opportunity to

control the outcome of David's case by illegally monitoring and physically retaliating against him, his wife and children.

154.  David Haigler hoped and believed that if he dropped the case, gave back all the evidence, and left the state that his family would be left alone.  David dropped the case, packed up, and on Thursday, September 24, 2010 started their journey to Michigan.  As they were leaving the state David stopped by Grand Canyon University and personally gave Christopher Richardson items that include but are not limited to, all of his original evidence, external hard drives, and computers containing all of David's family pictures that had never been printed out.

### Continued breaking in and physical retaliation

155.  During the initial couple of weeks after reaching Michigan, David Haigler started to receive emails from the Department of Education and the Military.  David also continued to experience various physical symptoms that were abnormal and something he had never experienced before.  Due to David's unusual physical symptoms he had to quit taking all of his medication, one of which he had taken for over fifteen years.

156.  In addition to the events referenced in (155), David and his family were staying at his friends parents house and during their stay a Mormon/LDS member created a telephone call from Texas, which called and played the same exact message David had left on the Arizona phone number, back in 2009, who was prank calling him as referenced in (90).

### Signing separation and release agreement under Duress and Undue Influence

157.  After several weeks of being back in Michigan David Haigler received from Christopher Richardson both of his computers and an external hard drive.  Christopher also

included the original separation and release agreement they originally wanted David to sign after terminating him.

158. After examining both computers and the external hard drive that was sent back to him, David Haigler found that they had left the majority of all the original evidence on the hard drive. David also found that Christopher Richardson had erased evidence that included but is not limited to, the Richardson brother's fraudulent business practices. David also discovered a recording that had been put on the computer which was fraudulently obtained and created.

159. Realizing that the Church of Jesus Christ of Latter Day Saints members were still retaliating and intimidating him through various methods in Michigan, David believed signing the separation and release agreement would end the retaliation. David signed the separation and release agreement under duress and undue influence and sent it back to Christopher Richardson.

## Continued retaliation and affirmation the

## Church of Jesus Christ of Latter Day Saints were still involved

160. During the following months David Haigler continued to experience major physical issues and had difficulty in getting doctors to perform any tests. David's primary care physician believed that there was physical retaliation done to him by Mormon/LDS members, but could not figure out how to fix the consequences of it.

161. Knowing that the Mormon/LDS members were still physically retaliating against him, David Haigler inquired with various individuals that included but is not limited to Private Investigators. The private investigators told David dropping everything was the worst decision due to the fact that now they had no incentive to stop. On the other hand David's counselor, who

was the daughter of an FBI agent, warned him not to go back to Arizona or to do anything against the Church of Jesus Christ of Latter Day Saints because of even more retaliation that could occur.

162.  While attempting to work a full time job, go to school, take care of his family, and continue to try and find medical help, David Haigler worked on finding a way to defend his family and himself.  Through the following months David decided to initially go after Marshall Martin for Negligence, Breach of Contract, and Breach of Fiduciary Duty.  David knew he could prove all accusations against Marshall including that his original case of wrongful termination would have been successful and would have been able to collect the financial remedies.

163.  After attempting to work on the case against Marshall Martin, David started to experience similar retaliatory tactics as when he attempted a case against Grand Canyon Education, Inc and Grand Canyon University, Inc.  These retaliatory actions include but are not limited to David's computer crashing when looking up evidence and after discussing possible evidence with his wife at home; the evidence would disappear within days.

164.  Through his continuing investigation, David Haigler was able to learn that Marshall Martin was part of a group of attorney's that help Mormon/LDS members settle cases for their benefit.  Due to David's uncovering of this evidence is why he believes the Church of Jesus Christ of Latter Day Saints continued to have its members engage in retaliation.

### Details of the Church of the Latter Day Saints continued Retaliation

165.  After almost a year of research and discovery, David Haigler was able to scan his body and find that there were objects containing metal in his body.  David was also able to confirm that there were objects containing metal in his wife and children, along with his friend.

The areas that revealed objects containing metal were also areas where David was continually experiencing medical issues that include but are not limited to severe vibrations.

166.  David Haigler asserts that the equipment used on him involves external and invasive technology that works on the nervous and muscular systems.  This technological equipment can be found used throughout the medical and military community for both healing and destroying an individual.  Through research and discovery David asserts that the Church of Jesus Christ of Latter Day Saints have current and former military, government, and medical members who are skilled in all areas to administer and use the technological equipment David is describing.

167.  David Haigler asserts that the Church of Jesus Christ of Latter Day Saints are constantly monitoring, altering and sabotaging his ability to use and work freely on his computer and internet.  David continues to have issues with his computer that include but are not limited to crashing when looking up evidence, erasing of email accounts and having his tax software used. David asserts the Church of Jesus Christ of Latter Day Saints is using his computer for their own purposes and to the detriment of himself.

168.  David asserts that the Mormon/LDS members chosen by the Church of Jesus Christ of Latter Day Saints have used the technology described in (165-167) to physically and physiologically attack him, his wife, his children and other individuals that have been associated with him.  These attacks have been meant to keep David quiet and limit his ability to find help and support to defend his wife, children, and himself.

169.  Based on two years of research, discovery, and personal witnessing, David Haigler asserts that the Church of Jesus Christ of Latter Day Saints is involved in the persecution not just

of him, but others that could have supported him.  David asserts that the Mormon/LDS members have persecuted individuals at David's former place of employment, Pine Rest Christian Mental Health Services.  David asserts that the Mormon/LDS members have also persecuted individuals at David's former place of worship, Wellspring Community Church.

170.  David Haigler asserts that the Church of the Latter Day Saints help in monitoring him has been giving Christopher Richardson and Grand Canyon Education, Inc the opportunity to alter evidence in order succeed in litigation.  David asserts that their goal is to attempt to make any of his accusations a mute point due to recent changes they have made.

## CONCLUSION

171.  In the end David Haigler learned that he had stumbled upon a far greater and more complex situation than he ever imagined.  However complex the situation is, David knows that until he defends himself against the Church of Jesus Christ of Latter Day Saints, the situation will continue.  David has uncovered evidence that will show how the Church of Jesus Christ of Latter Day Saints retains ex-military, law enforcement, and government officials to help them in protecting their way of life.  David asserts that both the simple and sophisticated retaliation is clearly attached to the Church of Jesus Christ of Latter Day Saints decision to support its fellow Mormon/LDS member's engagement of fraudulent business activities.

172.  Regardless of the motives of the Church of Jesus Christ of Latter Day Saints and their involvement of covering up and retaliating against David, the facts of David's case speak for themselves.  David's whistle-blowing of all the violations he encountered was a protected act under State and Federal Laws.  As stated throughout his complaint, the undertone of David's entire case has to do with the Church of Jesus Christ of Latter Day Saints and their associates

intentionally and maliciously sabotaging his ability to receive his legal right of remedy.  The

Church of Jesus Christ of Latter Day Saints and their associates have proven they will use all of

their money, power, and connections in order to retaliate in any and all ways to keep David quiet.

174.  Due to all of the allegations David Haigler has presented through paragraphs 1-173,

David respectfully requests the court consider the following causes of action.

### FIRST CAUSE OF ACTION

(Tort, Breach of Fiduciary Duty, Breach of Contract, and Negligence)

175.  David Haigler hereby re-alleges all allegations in Paragraphs 1-173 above.

176.  As is set forth above, David Haigler's representation of his wrongful termination

case was purposely sabotaged by Marshall A. Martin.  Marshall A. Martin violated the following

Arizona Rules of Professional Conduct that includes but is not limited to ER 1.2, abiding by his

client's decisions, ER 1.3, acting with reasonable diligence, ER 1.5, exploiting a fee arrangement,

ER 3.2, reasonable effort to expedite litigation, ER 7.1, making false or misleading

representations of services, ER 1.16, withdrawing causing material adverse effect, ER 8.4,

attempting to violate the Rules of Professional Conduct, and ER 3.3, making false statements to

the court.

177.  Marshall A. Martin also violated the following Arizona Statutes that include but is

not limited to A.R.S. 13-2202 (A)(2), regarding deceptive business practices, A.R.S. 44-1522,

regarding use of fraud, false promise, and misrepresentation, A.R.S. 44-101, regarding fraud,

and A.R.S. 44-121, regarding violation of contract.

178.  Due to Marshall Martin's Breach of Fiduciary Duty, Breach of Contract and

Negligence, David Haigler has suffered the loss of his legal right of recourse for wrongful

termination. David has also suffered loss of money, emotional distress and the corresponding anxiety and stress relative to the same.

179. In addition to all of the damages to which David Haigler might be entitled, he is entitled to an award of punitive damages under Arizona law due to the outrageous conduct of Marshall Martin in this matter, which was intentional, malicious and was specifically undertaken to harm David Haigler.

## SECOND CAUSE OF ACTION

(Tort, Original Wrongful Termination Case would have been successful)

180. David Haigler hereby re-alleges all allegations contained in Paragraphs 1-173 above.

181. As is set forth above, David Haigler refused to participate in illegal conduct and repeatedly whistle-blew to the highest levels of management at Grand Canyon regarding the illegal conduct of others. This illegal conduct included but is not limited to violations of A.R.S. 32-3051 regarding post secondary education, A.R.S. 44-1278 regarding telephone solicitations, A.R.S. 44-1282 regarding telephone solicitations, A.R.S. 44-1481 regarding false advertising, A.R.S. 44-1522 regarding consumer fraud and A.R.S. 44-401 regarding misappropriation of trade secrets.

182. Grand Canyon Education, Inc's decision to terminate David Haigler's employment based on his refusal to engage in illegal conduct and/or his whistle blowing/reporting of such conduct, constitutes a wrongful termination in violation of A.R.S. 23-1501 (3)(c)(i) and (ii).

183. Due to this wrongful termination, David Haigler has suffered a loss of employment, including loss of salary and employment benefits, which include but is not limited to health

insurance and tuition benefits.  David will continue to suffer a loss of both salary and benefits

going forward.

184.  Due to his wrongful termination, David Haigler has suffered emotional distress

caused both by the termination itself, and the ramifications of that termination including a loss of

income, damage to his reputation in employment, and the corresponding anxiety, depression and

stress relative to the same.

185.  In addition to all of the damages to which David Haigler might be entitled, he is

entitled to an award of punitive damages under Arizona law due to the outrageous conduct of

Grand Canyon Education, Inc. in this matter, which was intentional, malicious and was

specifically undertaken to harm David Haigler.

### THIRD CAUSE OF ACTION

(Tort, Retaliation)

186.  David Haigler hereby re-alleges all allegations contained in Paragraphs 1-173

above.

187.  As is set forth above, David Haigler's refusal to participate in illegal conduct at

Grand Canyon University, whistle-blowing to the highest levels and pursuing legal action for his

wrongful termination, led to retaliatory actions.  The Defendants initiation and pursuit of

retaliatory actions violated Arizona statutes that include but are not limited to, A.R.S 13-1003

regarding Conspiracy to promote or aid of an offense, A.R.S. 13-1004 regarding Facilitation of

providing means or opportunity to commit an offense, A.R.S. 13-1504 regarding Criminal

Trespass in the first degree, A.R.S. 13-1505 regarding Possession of Burglary tools, A.R.S. 13-

1507 regarding Burglary in the second degree, A.R.S. 13-1602 regarding Criminal damage,

A.R.S. 13-1802 regarding Theft, A.R.S. 13-1205 regarding Unlawfully administering a narcotic drug or dangerous drug, A.R.S. 13-1203 regarding Assault, A.R.S. 13-1204 regarding Aggravated assault, A.R.S. 13-1201 regarding Endangerment and A.R.S. regarding Threatening or intimidation.

188.  The Defendants initiation and pursuit of retaliatory actions violated Michigan and Federal statutes that include but are not limited to, M.L.S. 750.85 regarding Torture, with intent to cause cruel or extreme physical or mental pain, Title 18 U.S.C.A. 2511 regarding intentionally intercepts electronic communication, M.L.S. 750.84 regarding Assault with intent to do great bodily harm, M.L.S. 752.794 regarding prohibited access to computer, M.L.S. 752.795 regarding prohibited conduct, M.L.S. 750.157(a) regarding Conspiracy to commit offense, M.L.S. 750.111 regarding Entering without breaking, M.L.S. 750.110(a) regarding Home invasion, M.L.S. 750.377(a) regarding Willful and malicious destruction of property.

189.  Due to the Defendants, David Haigler has suffered emotional and physical distress caused both by the initiation and pursuit of retaliatory actions.  The ramifications of these retaliatory actions include but are not limited to, loss of legal claim of wrongful termination, loss of income, damage to his reputation and the corresponding anxiety, depression and stress relative to the same.

190.  In addition to all of the damages to which David Haigler might be entitled, he is entitled to an award of punitive damages under Arizona, Michigan, and Federal law due to the outrageous conduct of the Defendants in this matter, which was intentional, malicious and was specifically undertaken to harm David Haigler.

## **FOURTH CAUSE OF ACTION**

(Tort, Duress and Undue Influence to Sign Separation Agreement and Release)

191. David Haigler hereby re-alleges all allegations contained in Paragraphs 1-173 above.

192. As is set forth above, David Haigler clearly had no intention of signing the separation agreement and release as referenced in (86). While there was clear threats and intimidation towards David when he was employed at Grand Canyon University, he attempted to handle them through the courts with his wrongful termination claim. Only when the retaliatory actions of the Defendants overwhelmed David did he finally succumb to signing the separation agreement.

193. The retaliatory actions included but are not limited to, Marshall Martin, threatening, use of fear tactics and finally sabotaging his case, Christopher Richardson engaging the Church of Jesus Christ of Latter Day Saints, Mormon/LDS members and associates to conspire and facilitate physical, emotional and physiological tactics on David, his wife, his children and others associated with him. After these retaliatory actions David involuntarily accepted the separation agreement and release, which permitted no other alternative to the circumstances that the Defendants created. There is no doubt that the Defendants knew of the unfairness of the resulting transaction of the separation agreement and release.

194. Due to the Defendants extreme intentional and malicious actions against David Haigler in order to deprive him of exercising his free will, David requests that the court void the separation agreement and release.

195.  In addition to all of the damages to which David Haigler might be entitled, he is entitled to an award of punitive damages under Arizona, Michigan and Federal law due to the outrageous conduct of the Defendants in this matter, which was intentional, malicious and was specifically undertaken to harm David Haigler.

**WHEREFORE**, David Haigler requests relief as follows:

A.  An award of all lost wages and benefits, both past and future.

B.  An award of $250,000 in compensatory damages, including but not limited to emotional distress damages.

C.  For an award of $100,000,000 in punitive damages.

D.  Such further relief as the Court deems proper.

**RESPECTFULLY SUBMITTED** this 5th day of September, 2012.

David Haigler, Pro Per

David Thomson Haigler
2936 Northwoods Lake Court
Duluth, GA  30096
Cell Phone: (616) 334-0055
Email: joyfultrials@gmail.com
Pro Per